IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTHONY D. HARRIS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB 09-1109 |
| THE HOME SALES COMPANY, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiff Anthony Harris ("Harris") brings this action against Defendant Apartment Services, Inc. ("Apartment Services") and its corporate affiliate, Defendant The Home Sales Company, alleging it violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 when it terminated him in May 2005. Harris alleges that he was fired because he is African-American, and that his termination was also a product of retaliation for complaining to his manager about being treated unfairly. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendant Apartment Services's Motion for Summary Judgment (ECF No. 18) is GRANTED.

## BACKGROUND

This Court reviews the facts relating to this claim in the light most favorable to the plaintiff. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Defendant Apartment Services owns and manages approximately forty apartment and townhome communities throughout Maryland and southern Pennsylvania. Ray Wilkens Tr. 34;

1

Trudy Via Aff. ¶ 10. Each property has on-site leasing and service staff headed by a full-time supervisor. Wilkens Tr. 23-25; Via Aff. ¶ 11. Due to the large number of properties maintained by Apartment Services, maintenance employees are often transferred between properties. Via Aff. ¶ 14.

Apartment Services hired Harris as a maintenance technician in March 1997. Harris Tr. 48. In this role, Harris worked at a number of Apartment Services's properties. *Id*. 48-50. In 2000, Apartment Services promoted Harris to the position of maintenance supervisor at its Rosalind Gardens ("Rosalind") property. *Id*. 51-52. During this time, Harris lived rent-free in a townhome supplied by Apartment Services on one of its properties, McDonogh Village, which was only a short drive away from Rosalind. *Id*. 50, 55-57. Harris remained in his job as maintenance supervisor at Rosalind until April 2005. *Id*. 57. Harris's supervisor at work, Jeff Steinhoff, has stated that Harris's performance was generally average, though he was often unreachable during the workday without providing any explanation as to his whereabouts. Jeff Steinhoff Tr. 75-76. Steinhoff says that he repeatedly asked Harris to be more communicative and accountable during the workday. *Id*. 75-76; Harris Tr. 71-72.

At some point in March or April 2005, Steinhoff informed the Rosalind maintenance employees, as well as the maintenance employees at two other properties, that a new property management company, CT Management, Inc. ("CT Management"), would take over operations of these properties as of May 1, 2005. Harris Tr. 58-59; Steinhoff Tr. 30-32. In return, Apartment Services would assume the management of Somerset Woods ("Somerset"), one of CT Management's properties in Severn, Maryland. *Id*.; Hamlett Tr. 11-15. Steinhoff then offered Harris and the other maintenance workers the opportunity to stay with Apartment Services at a different property at the same pay and benefits, depending on availability, or to remain at

2

Rosalind working for CT Management. Harris Tr. 58-60; Steinhoff Tr. 30-32. After meeting with CT Management, all of the employees, including Harris, decided to stay with Apartment Services. Steinhoff Tr. 41; Harris Tr. 60.

Having taken over responsibility for Somerset Woods as of May 1, Apartment Services needed to fill the position of maintenance supervisor for the property by that date. Hamlett Tr. 11, 18-19; Steinhoff Tr. 64, 74. Steinhoff encouraged Todd Hamlett, Apartment Services's Vice President of Operations, to offer Harris the supervisor position. Hamlett Tr. 16-17; Steinhoff Tr. 67-68. Accordingly, in late March or early April, Steinhoff informed Harris of the open supervisor position at Somerset. Harris Tr. 62-63. Harris did not immediately accept the position, but instead asked for more information about the pay and benefits for this position. Harris Tr. 103, 106, 119. At some point thereafter, Hamlett offered the position to Mike King, a Caucasian supervisor-in-training with two years more experience than Harris who had expressed interest in the job and immediately accepted. Hamlett Tr. 21-22; King Tr. 8, 33-41, 55-57. At deposition, Harris testified that he was distraught when he found out that King, who Harris considered less experienced, had been given the supervisor position at Somerset. Harris Tr. 47-49, 119-20.

According to Apartment Services, Harris did not confirm his desire to transfer to Somerset until the end of April, at which point he was informed that the supervisor position had been filled, but that he could transfer as a technician at the same pay. Hamlett Tr. 23-24, 47. Harris then sought a job with Maryland Management Company ("Maryland Management"), a competitor of Apartment Services. Summ. J. Mem. at 8. Apartment Services contends that on May 2—Harris's first day at Somerset—he stopped by a medical facility on his way to work to

3

provide a sample for Maryland Management's drug test, and returned to the facility in the afternoon to receive a "post-offer physical." Summ. J. Mem. at 8; Ex. 11.

After Harris arrived at Somerset on May 2, he claims that he greeted King through the doorway of the leasing office and overheard the person King was talking to on his cell phone say: "Tell that nigger to get to work on time." Harris Tr. 120-21. Harris alleges that King then said something to the effect of, "Todd says to get to work on time." *Id*. King and Hamlett deny making and hearing this remark, respectively. King Tr. 83-85; Hamlett Tr. 30-32.

Harris alleges that on top of being "distraught" to hear that a white employee had taken the supervisor position, he felt "stressed" after hearing the alleged discriminatory remark on King's cell phone. Harris Tr. 129. Harris claims he tried to talk to Hamlett about his concerns, but that when he had not heard from Hamlett by May 5, he left work to take sick leave for his anxiety. Harris Tr. 130-31. Harris subsequently submitted a note from his doctor explaining that he needed three days off from work for sick leave. Harris Tr. 135-36.

On May 9, while Harris was on sick leave from Apartment Services, he went to Maryland Management's offices to complete his hiring paperwork. Harris Tr. 168-71. Harris's offer letter from Maryland Management, dated May 9, 2005, indicates that his start date would be May 16, 2005. Summ. J. Mem. Ex. 14. At deposition, Harris claimed that he felt he had to seek alternative employment while he was on sick leave because his "job was on the line" and because he "had nowhere to go." Harris Tr. 152-53, 158-59, 160-62, 169-70. Notably, Harris does not allege that Apartment Services ever indicated his job was in jeopardy.

Harris's doctor released him to return to work at Apartment Services on May 10, but he did not report to work that day. Harris Tr. 147-48. Harris claims he refused to return to work until hearing back from Hamlett because the thought of working for King made him

4

"emotionally sick." Harris Tr. 153-54. When Hamlett reached Harris by phone on May 11, Harris explained his dissatisfaction with the technician position at Somerset. Hamlett Tr. 43-44. Hamlett then offered to move Harris to Lawyers Hill, which was closer to Harris's home. *Id*. At deposition, Harris stated that he was "very happy" about that offer, yet according to Hamlett, Harris did not accept it. Hamlet Tr. 43-45, 48. Instead, Hamlett claims that Harris responded by asking to be laid off "so he could go do what he needed to do." Hamlett Tr. 43-45.

The next day, on May 12, Harris faxed several documents to Apartment Services's payroll department to ensure he would be paid for the week. Harris Tr. 165-66, 178-82; Summ. J. Mem. Ex. 16. Harris included with the fax a note to Hamlett complaining that he felt he was being treated unfairly. Harris Tr. 185-87; Summ. J. Mem. Ex. 17. Hamlett claims that by Friday, May 13, Harris had not gotten back to him about the Lawyers Hill position. Hamlett Tr. 65-66. Because Harris had not reported to work for at least two days, Hamlett decided to terminate his employment pursuant to company policy, which states that an unexcused absence of one day is considered job abandonment. Hamlett Tr. 66-69, 72-74. Hamlett informed Harris of his termination by letter the next day, May 13, 2005. Summ. J. Mem. Ex. 19.

Three days later, on May 16, Harris began his new job at Maryland Management. Summ. J. Mem. Ex. 14; Harris Tr. 214-15. On June 13, 2005, Hamlett hired Donte Logan, an African-American, to replace Harris as Somerset Woods's maintenance technician. Hamlett Tr. 83-84. When Logan quit a few months later, Hamlett transferred Jeffrey Lewis, also an African-American, into the position. Hamlett Tr. 100-02.

STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

5

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249.

In undertaking this inquiry, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). After the moving party has established the absence of a genuine issue of material fact, the nonmoving party must present evidence in the record demonstrating an issue of fact to be resolved at trial. *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir. 1999)). Summary judgment will be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ANALYSIS

**I. Race Discrimination Claim (Count I)**

Harris may prove he was discriminated against through either direct or circumstantial evidence. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213-14 (4th Cir. 2007).

    **A.**     **Direct Evidence**

Even viewing the evidence in the light most favorable to Harris, he has not alleged any direct evidence of discrimination. At most, Harris contends that he heard Hamlett refer to him as a "nigger" through King's cell phone, but makes no connection between this alleged remark and his termination. As this Court has explained, an isolated, stray remark will not be deemed direct evidence of discrimination. *Escobar v. Montgomery County Bd. of Educ.*, 2001 U.S. Dist. LEXIS 1069, at *18 (D. Md. Feb. 1, 2001).

**B.      Indirect Evidence**

When a plaintiff has not alleged direct evidence of discrimination, a court must analyze the claim through the burden-shifting scheme laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, Harris may demonstrate a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Id*. at 802. If Harris makes this showing, the burden shifts to Apartment Services to produce evidence of legitimate, non-discriminatory reasons for terminating him. *Holland v. Wash. Homes, Inc*., 487 F.3d 208, 214 (4th Cir. 2007). If Apartment Services does so, Harris must then prove that Apartment Services's proffered reasons for terminating him are not true, but instead are a pretext for discrimination. *Id*.

**1.      Prima Facie Case**

Harris has not established a prima facie face of race discrimination because he has not alleged that his position remained open or was filled by a similarly qualified applicant outside of the protected class. As an initial matter, there is no dispute that Harris, an African-American, is

7

a member of a protected class, or that he suffered an adverse action when Apartment Services terminated him. Though Apartment Services raises some question as to Harris's accountability during the work day throughout his employment, they do not appear to challenge whether Harris was performing his job duties at an acceptable level before he took sick leave in May 2005, did not return to work, and was terminated.

However, Apartment Services emphasizes that there is no dispute regarding the fact that, after firing Harris, they hired Donte Logan, an African-American, to replace him. Thus, Harris cannot show that he was replaced by a person outside his protected class. Furthermore, Harris has not identified any similarly situated white employee who received more favorable treatment. *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009). The other two maintenance employees who were transferred were also African-American and were able to transfer into maintenance technician positions at other properties without job repercussions. Harris Tr. 102-03. Harris also has not shown that Apartment Services failed to terminate a white employee with one or more days of unexcused absences. Therefore, Harris has not established a prima facie case of discriminatory termination.

### 2. Legitimate, Non-Discriminatory Reasons for Harris's Termination

Even if Harris established a prima facie case of discrimination, he has not shown that Apartment Services's explanation for his termination—his unexplained absences—was a pretext for discrimination. *Holland*, 487 F.3d at 217. Harris concedes that he was able to return to work on May 10, and did not ask for more leave. Harris Tr. 147-48, 150-51. Harris does not dispute that after he spoke with Hamlett on May 11, he never got back in touch with Hamlett or anyone else at Apartment Services. *Id*. The evidence shows that when the termination letter was sent to Harris on May 13, it was sent pursuant to standard company policy.

8

At best, Harris argues that this Court should be persuaded by his claim that on May 11 Hamlett told him to take the rest of the week off, only to terminate him for job abandonment two days later. Harris supplied no evidence to support this contention, and admits that at the same time he was taking off work, he pursued, and received, a new job with a May 16 start date. Harris Tr. 168-71; Summ. J. Mem. Exs. 13, 14. Harris's self-serving testimony is insufficient to show that Apartment Services's reasons for terminating Harris were a pretext for discrimination. Accordingly, this Court grants Apartment Services's motion for summary judgment as to Count I.

## II.     Retaliation Claims (Counts II & III)

Harris also alleges that he was terminated in retaliation for complaining about unfair treatment in violation of Title VII and Section 1981. Harris claims that on May 12, 2005, the day before he was terminated, he faxed Hamlett a written grievance about his transfer to Somerset. To state a prima facie case of retaliation, Harris must show: (1) that he engaged in a protected activity; (2) Apartment Services acted adversely against him; and (3) the protected activity was causally connected to the adverse action. *Holland*, 487 F.3d at 218. Harris has not established that he engaged in protected activity. Even assuming that Hamlett received the letter before terminating Harris, the letter says nothing about race discrimination. Instead, the grievance merely states that Harris wanted to talk to Trudy Via, Apartment Services's Director of Human Resources, about his "employment and unfair job treatment by a property manager in the co[r]poration and request for vacation time." Summ. J. Mem. Ex. 17. This one sentence allusion to unfair treatment is not enough to trigger the protections of Title VII and Section 1981 or to put Apartment Services on notice that Harris felt he was being discriminated against on the basis of his race.

Even if this Court finds Harris's note to be protected activity, Harris has not shown that there is a causal connection between his sending this note and his termination. Hamlett has testified that did not see this letter before making the decision to terminate Harris. Hamlett Tr. 62-65. Given that Harris only sent this note the day before he was fired, and that he admits he faxed it directly to the payroll department—not to Hamlett—there is no reason to doubt Hamlett's testimony. Moreover, as explained above, Apartment Services has provided a legitimate, nondiscriminatory reason for terminating Harris which has not been rebutted. Accordingly, this Court grants Apartment Services's motion for summary judgment as to Counts II and III.

## CONCLUSION

For the reasons stated above, Defendant Apartment Services and Defendant The Home Sales Company's Motion for Summary Judgment (ECF No. 18) is GRANTED.

A separate Order follows.

Dated: March 7, 2011  /s/_____
Richard D. Bennett
United States District Judge